# Adjusting the Census for Recent Immigrants: The Chiles Amendment

The Chiles Amendment authorizes the President to order a special census pursuant to 13 U.S.C. § 196, or to use some other method of obtaining a revised estimate of the population, whenever he determines that the population of a particular area is significantly affected by an influx of immigrants within six months of a regular decennial census date.

The Chiles Amendment was intended simply to remove an unfairly arbitrary element from the census, and not to serve as an indirect means of aiding jurisdictions affected by large numbers of recent immigrants. Accordingly, the entire population of significantly affected jurisdictions must be estimated, in order to take into account both the recent influx of immigrants and any offsetting recent population decline.

December 11, 1980

## MEMORANDUM OPINION FOR THE ASSISTANT TO THE PRESIDENT FOR INTERGOVERNMENTAL AFFAIRS

This responds to your request for our opinion on certain issues raised by the Chiles Amendment, § 118 of Pub. L. No. 96-369, 94 Stat. 1351, 1357 (1980). The Chiles Amendment provides:

> Notwithstanding any other provision of law, when the President determines that a State, county, or local unit of general purpose government is significantly affected by a major population change due to a large number of legal immigrants within six months of a regular decennial census date, he may order a special census, pursuant to section 196 of title XIII of the United States Code, or other method of obtaining a revised estimate of the population of such jurisdiction or subsections of that jurisdiction in which the immigrants are concentrated. If the President decides to conduct a special census, it may be conducted solely at Federal expense.

You have suggested that the Chiles Amendment might be interpreted in one of two ways. On one interpretation, the President has only the authority to conduct a special census, either under 13 U.S.C. § 196 or in some other way. Alternatively, the amendment might be interpreted to give the President authority to order some other method of revising population figures that is different from a special census. You have asked our opinion on which of these possible interpretations is correct.

We believe the latter interpretation is correct. The Chiles Amendment permits the President to order either a special census or to obtain in some other way "a revised estimate of the population" of certain jurisdictions. 126 Cong. Rec. 27,551 (1980). We recognize that this interpretation is not necessarily suggested by the amendment's syntax; it would read the amendment to provide that the President "may order a . . . other method of obtaining a revised estimate of the population." *Id.* But we nonetheless believe that the amendment authorizes the President to order that some method other than a special census be used.

The Chiles Amendment was added by the Senate committee. The original version contained the first sentence of the provision that became law, followed by these two sentences:

> Any such special census [or] [1] revised estimate shall be conducted at Federal expense. Such special census or revised estimate shall be conducted no later than twelve months after the regular census date. . . .

126 Cong. Rec. 27,551 (1980). *See also* 126 Cong. Rec. 27,746 (1980); 126 Cong. Rec. 28,503 (1980). This language was deleted for no stated reason—the deletion was referred to on the floor of the House as "a slight modification of the Senate language," *see* 126 Cong. Rec. 28,504 (1980) (remarks of the Speaker)—but it suggests that, despite the syntax, Congress intended the first sentence to give the President a choice between a special census and some "other method of obtaining a revised estimate of the population." *Id.*

The Senate committee's explanation of its amendment removes any remaining doubt. It reads:

> The Committee adopted a new section . . . to allow the President to order a special census count *or use other means of revising census estimates* in those special situations where there is a large flow of legal immigrants within 6 months of the census enumeration, such as the recent influx of Cubans and Haitians. Where such a revision of census estimates occurs, the revised data shall be used for all normal purposes, including Federal funding formulas.

126 Cong. Rec. 27,554 (1980) (emphasis added). We believe that the Chiles Amendment, read in light of this committee explanation, authorizes the President to choose some method other than a special census to obtain a revised population estimate.

Your office has expanded upon your initial request by asking our views on what would qualify as an "other method of obtaining a

---

[1] The word "of" appears in the original; this is evidently a misprint for "or."

revised estimate of the population." In particular, you want our views on whether the President can simply order that the number of immigrants who entered a "significantly affected" jurisdiction within six months after a decennial census date—in this case, April 1, 1980—be added to the official census population, ascertained as of the most recent estimate or census from which data can be used for that jurisdiction. The possible objection to this method is that it ignores other population changes in the affected jurisdiction—for example, some affected jurisdictions may have lost population if the influx of immigrants was more than offset by a population decline resulting from other causes—and therefore is not an "estimate of the population."

We believe that the Chiles Amendment authorizes the President only to estimate the entire population of significantly affected jurisdictions. If there is reason to believe that adding the number of recent immigrants to the previous census figure will not accurately estimate the population of a jurisdiction, then the Chiles Amendment does not authorize such a method in that jurisdiction.

We can discern two purposes that the Chiles Amendment, or a measure like it, may have been intended to serve. Congress may have intended it simply as a means of funneling aid from federal programs based on population data, to jurisdictions with large numbers of recent immigrants. Congress may have felt that jurisdictions with large numbers of new immigrants have special problems and burdens even if their overall population has not increased. If this were Congress' objective, it would be acceptable—perhaps necessary—simply to add the number of new immigrants to the previous population figures, even if this method artificially inflated the population figures for certain jurisdictions.

Alternatively, Congress may have intended the Chiles Amendment to be a means of correcting an arbitrary feature of the census. The census does not count immigrants who enter a jurisdiction after April 1, 1980, although it would have counted them if they had entered before that date. Of course, some such arbitrariness is inevitable; but Congress may have believed that if very large numbers of immigrants were involved, the arbitrariness would be unfair and should be corrected. Congress may have believed that a census or estimate taken shortly after the immigrants had arrived would be more fair. If this was Congress' intention—to remove an unfairly arbitrary element from the census figures—then the President must attempt accurately to estimate the total population. He cannot simply add the number of new immigrants to the earlier population figures in cases in which he has reason to believe that such a method will not produce an accurate estimate.

Since, as we said, some jurisdictions may have large numbers of new immigrants but lose population overall, these two possible congressional purposes diverge to some extent; and to that extent, we believe Congress intended the latter objective. That is, it intended the Chiles

Amendment to reduce the arbitrariness of the census, not simply to serve as a means of aiding jurisdictions affected by large numbers of immigrants. We reach this conclusion for several reasons. First, we know of no instance—and the General Counsel's Office at the Department of Commerce advises us that it knows of none—in which Congress has tampered with the integrity of census figures in order to achieve other policy objectives. In the absence of a clear indication to the contrary, we will not assume that Congress intended to do so here. Second, the language of the Chiles Amendment—"a revised estimate *of the population*" (emphasis added)—suggests that Congress wanted the President to order a genuine effort to estimate the overall population. Indeed, if Congress intended artificially to inflate population figures, it is difficult to see why it authorized "a special census . . . of the jurisdiction"—not merely of the new immigrants—as one alternative.[2] Finally, Congress has enacted a carefully designed program providing aid to localities in dealing with some of the special burdens and problems associated with large populations of recent immigrants. *See* Pub. L. No. 96-422, 94 Stat. 1799 (1980) (Refugee Education Assistance Act of 1980). Since such a program exists, and is more carefully tailored to serve the purposes of aiding affected jurisdictions than the Chiles Amendment is, we doubt that Congress intended the Chiles Amendment to serve that purpose instead of the purpose for which it seems more clearly designed.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[2] In the only floor discussion of any length about the Chiles Amendment, Representative Garcia did say: "The number of legal aliens counted in this special census [authorized by the Chiles Amendment] would then be added to the official census figures and used for all legal purposes." *See* 126 Cong. Rec. 28,503 (1980). But Representative Garcia had no special qualification to speak authoritatively about the meaning of the Chiles Amendment; he was not, for example, a sponsor of the amendment. More important, his remark on this point was tangential to the principal subject of his statement on the floor, which was to make the point of order that a proposed amendment to the Chiles Amendment was not germane. Notably, Representative Garcia also said:

> The Senate amendment is limited to situations such as the unprecedented influx of Cuban refugees who were lawfully admitted into the country after the census got underway. Senator Chiles' amendment is limited in scope and addresses a unique problem not heretofore encountered in the census.

*Id.* This remark was much more directly related to the principal subject of Representative Garcia's statement—he was characterizing the Chiles Amendment in order to raise the point of order—and this remark reinforces our interpretation of the Chiles Amendment.